UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LESLIE JOHNSON, | ) | CIV. 17-4043-LLP |
| | ) | |
| Plaintiff, | ) | |
| | ) | BRIEF IN SUPPORT OF |
| v. | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT |
| DENNIS DAUGAARD, Governor of | ) | |
| South Dakota, in his private and | ) | |
| public capacity; DENNY KAEMINGK, | ) | |
| Secretary of Corrections, in his private | ) | |
| and public capacity; ROBERT | ) | |
| DOOLEY, Chief Warden, in his private | ) | |
| and public capacity; NANCY | ) | |
| CHRISTENSEN, Unit Manager, in her | ) | |
| private and public capacity; | ) | |
| ALEJANDRO REYES, Associate | ) | |
| Warden, in his private and public | ) | |
| capacity; ROB CARUANA, ADA | ) | |
| Coordinator, in his private and public | ) | |
| capacity; and MISTY JOHNSON, | ) | |
| Clinical Supervisor, Mike Durfee State | ) | |
| Prison, Medical Services, in her | ) | |
| private and public capacity. | ) | |
| | ) | |
| Defendants. | | |

The following brief is submitted by the above-named Defendants, Dennis

Kaemingk, Robert Dooley, Nancy Christensen, Alejandro Reyes and Rob

Caruana, pursuant DSD Civ. LR 7.1(b), Local Rules of Practice of the United

States District Court, in support of their Motion for Summary Judgment.  A

review of the Exhibits and Affidavits attached hereto readily reveals that there

is no merit whatsoever to the allegations by Inmate Johnson that Defendants

have violated Title II of the Americans with Disabilities Act (ADA).  Equally

without merit are the assertions by Johnson that Defendants have retaliated against him in violation of Title V of the ADA.

MONETARY DAMAGES

It must be noted at the outset that Johnson is not entitled to the monetary damages requested herein. As previously found by this Court, in its Order dated March 22, 2018, "Although a State and any Department of a State are 'public entities' under Title II of the ADA (*see Klinger v. Director, Dept. of Revenue,* 433 F.3d 1078, 1080 (8th Cir. 2006)), Defendants in their individual capacity do not constitute 'public entities' subject to suit under Title II of the ADA." Doc. 20, p. 331. The Court, citing to *Alsbrook v. City of Mammelle,* 184 F.3d 999, 1005, n. 8 (8th Cir. 1999) (citing *Transamerica Mortgage Advisers, Inc. v. Lewis,* 444 U.S. 11, 19 (1979)), held that "The Eighth Circuit held in an *en banc* decision that Congress' designation of liability for 'public entities' under Title II of the ADA necessarily implied that there was no liability for individuals under that statute." Doc. 20, p. 331. According to the Court, "That decision has been followed by subsequent Eighth Circuit panels." *See Dinkins v. Correctional Medical Services,* 743 F.3d 633, 634 (8th Cir. 2014) (per curiam); *Baribeau v. City of Minneapolis,* 596 F.3d 465, 484 (8th Cir. 2010).

A plaintiff, as indicated by the Court in its Order dated March 22, 2018, "may assert a Title II claim for injunctive relief against a State employee in his or her official capacity." Doc. 20, p. 332. As found by the Court, "The 11th Amendment does not bar the granting of injunctive relief." *See Bradley v. Ark. Dept of Educ.,* 189 F.3d 745 (8th Cir. 1999), *vacated in part on other grounds,*

*Jim C. v. Ark. Dept. of Educ.,* 235 F.3d 1079 (8th Cir. 2000); *Missouri Child Care Assn. v. Cross,* 294 F.3d 1034 (8th Cir. 2002).  It was said that "The above law makes clear that Johnson cannot receive money damages on his ADA claim(s) nor can he sue any Defendant in his or her individual capacity."  Doc. 20, p. 332.  Johnson's Title II claims against Defendants in their individual capacity were therefore dismissed by this Court.

As recently indicated in *Anderson v Dooley,* 2017 WL 2937599 at *3 (D.S.D.), the question of whether defendants can be held liable for damages under Title II of the ADA or whether they are immune from suit under the 11th Amendment, depends upon a three-part analysis.  *United States v Georgia,* 546 U.S. 151, 159 (2006).  The court must determine:

> (1) which aspects of the State's alleges conduct violated Title II; (2) to what extent such misconduct also violated the 14th Amendment; and (3) insofar as such misconduct violated Title II but did not violate the 14th Amendment, whether Congress' purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id.* (citing *Georgia,* 546 U.S. 159).  *See also Klinger v. Director, Dept. of Rev.,* 455 F.3d 888, 891 (8th Cir. 2006).  The sovereign immunity determination must therefore be made on a "claim-by-claim" basis."  *Id.* at 892; *JT ex rel Harvell,* 2009 WL 262094, at *10.

Defendants would asset that, as in *Klinger,* 455 F.3d at 892, "Even though Title II may validly abrogate the State's sovereign immunity in some cases, the present case is not one of them.  As was recognized in *JT ex rel Harvell,* 2009 WL 262094, at *10, "To the extent the State's conduct does not

violate the 14th Amendment, it is immune from money damages." *See also Day v. Minnesota,* 2007 WL 4321999, at *19 (Minn.).  As will be discussed in greater detail below, "Because the conduct that the Plaintiff allege[s] does not, in itself, violate the Constitution, under *Georgia,"* Congress did not validly abrogate Defendants' 11th Amendment immunity under the circumstances presented by Johnson. *Id.*

## MOOTNESS

Defendants would respectfully submit that the various claims raised herein by Johnson have been rendered moot as a result of the Settlement Agreement entered into between the SDDOC and DOJ on or about October 23, 2018.[1]  As noted in *Gropper v. Fine Arts Housing, Inc.,* 12 F.Supp.3d 664, 669 (S.D.N.Y. 2014), "The mootness doctrine is derived from Article III of the

---

[1] As indicated in the Exhibits attached hereto, Johnson was scheduled to be released from the MDSP and placed on parole on August 16, 2019.  Exhibit 20. He was, as scheduled, released to parole on August 16, 2019. Reyes Affidavit, ¶51; Exhibit 21.  Defendants would assert that Johnson's release on parole serves to render moot his request for injunctive/declaratory relief. *Dale v. Kaemingk,* 2016 WL 6915268, at *1 (D.S.D.) (citing *Hickman v. Missouri,* 144 F.3d 1141, 1142 (8th Cir. 1998) (holding that prisoner's claims for declaratory relief under the ADA were moot once the prisoners were released on parole)). *See also. Caskey v. Dooley,* 2018 WL 4519190, at *6 (D.S.D.); *Parks v. Dooley,* 2011 WL 847011, at *13 (D.S.D.).  "The fact that he [Johnson] is on parole and could be sent back to the authority of these very same officers, is insufficient to revive a claim that was rendered moot be his release." *Id.*

Defendants are aware that Johnson's release on parole does not serve to render moot his request for monetary damages. *Wycoff v. Brewer,* 572 F.2d 1260 (8th Cir. 1978); *Keup v. Hopkins,* 596 F.3d 899, 904 (8th Cir. 2010).  As already indicated, however, elsewhere herein, the Court, in its Order dated March 22, 2018, found that "The ... law makes clear that Johnson cannot receive money damages on his ADA claim(s) nor can he sue any Defendant in his or her individual capacity."  Doc. 20, p. 332.

Constitution which grants the judicial branch authority to adjudicate 'cases' and 'controversies.'"   According to the court, "In our system of government, courts have no business deciding legal disputes or expounding on law in the absence of such a 'case' or 'controversy.'"   *Id.* (citing *Already, LLC v. Nike, Inc.,* 133 S.Ct. 721, 726 (2013)).   "An actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation."   *Id.*

It has been said that "If circumstances change after the suit begins so that the plaintiff no longer has anything to gain from the relief requested in the lawsuit, then the case becomes moot."   *Hillesheim v. Buzz Salons, LLC,* 2017 WL 3172870, at *3 (Minn.) (citing *Smith v. Geneva Props. LP.,* 2016 WL 7404744, at *2 (Minn.)).   A case, therefore, becomes moot, and no longer a "case" or "controversy" for purposes of Article III, "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."   *Gropper,* 12 F.Supp.3d at 669.   Defendants would assert that, as recognized by the Court in *Maday v. Dooley,* Civ. 17-4168-KES, Doc. 188, p. 2614, it would be difficult to "address how individual injunctive relief in this case would be different from, or any more effective than, the Settlement Agreement already in place with the DOJ."   Johnson, therefore, "No longer has anything to gain from a favorable resolution of his ADA claim."   *Hillesheim,* 2017 WL 3172870, at *8 (citing *Davis v. Queen Nelly, LLC,* 2016 WL 5868066, at *1 (D. Minn.)).

There is no dispute that "A defendant's voluntary removal of alleged [architectural] barriers prior to trial can have the effect of mooting a plaintiff's

ADA claim." *Hillesheim,* 2017 WL 3172870, at *3 (citing *Oliver v. Ralphs Grocery Co.,* 653 F.3d 903, 905 (9th Cir. 2011)).  Defendants recognize that "The standard ... for determining whether a case has been mooted by defendant's voluntary conduct is stringent." *Gropper,* 12 F.Supp.3d at 670.  It has been said that "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (citing *Friends of The Earth, Inc., v. Laidlaw Environmental Services, Inc.,* 528 U.S. 167, 189 (2000)).  *See also Wright v. RL Liquor,* 887 F.3d 361, 363 (8th Cir. 2018).  Defendants, however, would assert that the voluntary-cessation doctrine does not apply where, as here, "defendants' compliance with the ADA. . . is far more than a mere voluntary cessation of alleged illegal conduct, where we would leave [t]he defendant[s] ... free to return to [their] old ways." *Wright,* 887 F.3d at 363 (citing *Hickman v. State of Mo.,* 144 F.3d 1141, 1143 (8th Cir. 1998).

Here, as in *Hillesheim,* 2017 WL 3172870, at *6, Defendants' efforts to address issues identified by the DOJ during it inspection of the MDSP on December 1, 2016, "demonstrate a mindset of compliance rather than simply an effort 'to defeat injunctive relief by protestations of repentance and reform.'" Moreover, the Settlement Agreement entered into between the SDDOC and DOJ expressly states that the SDDOC "shall implement all reforms necessary to effectuate the terms of this Agreement" and the DOJ reserves the right to institute a civil action to enforce the Agreement if SDDOC fails to implement the terms thereof.  Reyes Affidavit, ¶9; Fluke Affidavit, ¶9; Exhibit 16.

Defendants, therefore, would respectfully assert that, as in *Hillesheim,* the record reflects that Defendants will "remain compliant with the ADA and future violations are not reasonabye expected to reoccur." *Id.* Assuming, for sake of argument, that Johnson's claims have not been rendered moot as a result of the afore-mentioned Settlement Agreement entered into between the SDDOC and DOJ, the record will show that there is no merit whatsoever to his claims that Defendants have not been willing to comply with the ADA since 2011.

*PRIMA FACIE* CASE OF DISABILITY DISCRIMINATION

As noted by this Court, in its Order dated March 22, 2018, in order to state a claim under Title II of the ADA against Defendants in their official capacity, Johnson must establish:

> (1) that he is a qualified individual with a disability; (2) that he was excluded from participation in or denied the benefit of the [prison's] services, programs or activities, or was otherwise subjected to discrimination by the [prison]; and (3) that such exclusion, denial of benefits, or other discrimination was by reason of his disability.

Doc. 42, pp. 545-546; Doc. 20, P. 332.  *See Baribeau v. City of Minneapolis, ,* 596 F.3d 465,484 (8th Cir. 2010).  It is therefore well established that "[T]he first element of a *prima facie* case of disability discrimination requires proof that plaintiff was 'disabled' within the meaning of the ADA." *Wilking v. County of Ramsey,* 153 F.3d 869, 872 (8th Cir. 1998); *Cody v. Prairie Ethanol, LLC.,* 763 F.3d 992, 996 (8th Cir. 2014).  *See also Jelsma v. City of Sioux Falls,* 744 F.Supp.2d 997, 1005 (D.S.D. 2010); *Gesinger v. Burwell,* 210 F.Supp.3d 1177, 1190 (D.S.D. 2016).  Johnson thus has the initial burden to establish a *prima facie* case of discrimination on the basis of his alleged disability.  *Lors v. Dean,*

595 F.3d 831, 834 (8th Cir. 2010); *St. Martin v. City of St. Paul,* 680 F.3d 1027, 1032 (8th Cir. 2012).

In denying Defendants' Motion to Dismiss, dated June 6, 2018, this Court found that "*Res judicata* does not prevent a plaintiff from relitigating the issue of his disability relating to a different time period than was adjudicated in the former action." Doc. 42, p. 546. The Court, in declining to adopt the previous finding by the State court that Johnson was not disabled, stated that "More than 5 years has passed since the circuit court addressed whether Johnson was 'disabled' under the ADA and Johnson now alleges that he is confined to a wheelchair." Doc. 42, p. 547. According to the Court, "Human health is rarely static." The Court, therefore," found that Johnson was "not precluded by the circuit court's judgment from relitigating whether he is 'disabled' within the meaning of the ADA." Doc. 42, p. 547.

Defendants would respectfully submit that the Affidavits and Exhibits attached hereto readily reflect that Johnson's condition has "not changed that much from a few years ago" and that he is still "not entirely confined to a wheelchair" for purposes of the ADA. Hanvey Affidavit, ¶6; Wallinga Affidavit, ¶6. The ADA defines disability as "A physical or mental impairment that substantially limits one or more major life activities of such individual." *Petersen v. Proxymed, Inc.,* 617 F.Supp.2d 835, 842 (D.S.D. 2008); *Fahey v. Twin City Fan Companies, LTD.,* 994 F.Supp.2d 1064, 1071 (D.S.D. 2014). A review of the record reflects that Johnson has been diagnosed with COPD, chronic leg weakness and impaired balance which led Health Services at the

MDSP to recommend the use of a wheelchair "for any distances traveled." Hanvey Affidavit, ¶7; Wallinga Affidavit, ¶7; Exhibit 9.

Despite Johnson's apparent beliefs to the contrary, it is well established that "merely having an impairment does not make one disabled for purposes of the ADA." *Ponder v. Verizon North, Inc.,* 2010 WL 4868080, at *9 (E.D. Mo.) (citing *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 195 (2002)). As found in *Petersen,* 617 F.Supp.2d at 842, "Health conditions that cause moderate limitations on major life activities do not constitute disabilities under the ADA." *Orr v. Wal-Mart Stores, Inc.,* 297 F.3d 720, 724 (8th Cir. 2002). Thus, while Johnson may experience difficulty walking long distances or climbing stairs, it has been said, on repeated occasions, that "these moderate limitations on major life activities do not suffice to constitute a 'disability' under the ADA." *Weber v. Strippit, Inc.,* 186 F.3d 907, 914 (8th Cir. 1999), *cert denied,* 528 U.S. 1078 (2000); *Wood v. Crown Redi-Mix,* 339 F.3d 682, 685 (8th Cir. 2003); *Schmidt v. Metropolitan Utilities Dist.,* 325 Fed. Appx. 479, 480 (8th Cir. 2009) (citing *Gretillat,* 481 F.3d at 653)).  *See also Rickmyer v. ABM Security Services, Inc.,* 2016 WL 1248677, at *4 (Minn.) (citing *Crown,* 339 F.3d at 685); *Higdon v. Chrysler Group, Inc.,* 2011 WL 6740424, at *6 (E.D. Mo.); *Ponder,* 2010 WL 4868080, at *9; *Williams v. Silvey,* 2009 WL 2231670, at *5 (E.D. Mo.).  Defendants would submit that, as in *Wood,* 339 F.3d at 686, while the limitations on Johnson's ability to walk long distances are "real, and they certainly inconvenience his life ... they are insufficient to sustain an ADA claim

9

....” Here, as in *Rickmyer,* 2016 WL 1248677, at *4, Johnson “does not allege that he is completely unable to walk.”

A review of Johnson's medical records reflect that Johnson is still more than able to walk, albeit short distances. He merely, as a convenience, uses a wheelchair for “any distances traveled.” Hanvey Affidavit, ¶8; Wallinga Affidavit, ¶8. When seen by Health Services on November 12, 2015, Johnson “states he does get short of breath and tired, but he attributes that more to being unable to exercise.” Hanvey Affidavit, ¶9; Wallinga Affidavit, ¶9; Exhibit 1. Johnson, however, was previously seen by Dr. Fausch on October 20, 2015, and was said to be “stable from a cardiovascular standpoint with risk factors being well managed.” Hanvey Affidavit, ¶10; Wallinga Affidavit, ¶10; Exhibit 1. The doctor, therefore, “encouraged more activity.” Hanvey Affidavit, ¶10; Wallinga Affidavit, ¶10; Exhibit 1.

Although indicating that he “feels like he is going to fall quite often,” Johnson told Health Services that he “stands and walks occasionally.” Hanvey Affidavit, ¶11; Wallinga Affidavit, ¶11; Exhibit 1. An Authorization Request was therefore submitted for “Physical therapy to evaluate his generalized weakness and unsteady gait” and to develop “an exercise plan for him so that he can be more ambulatory with less dependence on his wheelchair.” Hanvey Affidavit, ¶12; Wallinga Affidavit, ¶12; Exhibit 1. It was also recommended that Johnson be provided with “improved footwear with possible insoles so that he would be able to ambulate more.” Hanvey Affidavit, ¶12; Wallinga Affidavit, ¶12; Exhibit 1.

10

When later seen by Health Services at the MDSP on May 12, 2016, Johnson indicated that while he "continues to use his wheelchair for any distance," he "does do some walking around the Unit."  Hanvey Affidavit, ¶14; Wallinga Affidavit, ¶14; Exhibit 2.  The record reflects that, with regards to his "problems with balance and strength, Johnson "did see physical therapy and received some exercises to do on a daily basis."  Hanvey Affidavit, ¶15; Wallinga Affidavit, ¶15; Exhibit 2.  According to Johnson, "He's been compliant with doing these." Hanvey Affidavit, ¶15; Wallinga Affidavit, ¶15; Exhibit 2.  Although Johnson was said to be "holding on to something when he tries to stand due to poor balance," he was "able to get in and out of his wheelchair without assistance."  Hanvey Affidavit, ¶16; Wallinga Affidavit, ¶16; Exhibit 2.  Johnson was also able to "climb up to the exam table without assistance." Hanvey Affidavit, ¶16; Wallinga Affidavit, ¶16; Exhibit 2.

Johnson, when seen by Health Services on December 8, 2016, complained, inter alia, that he "had cramps in the lateral calf of his right leg over the last few weeks."  Hanvey Affidavit, ¶17; Wallinga Affidavit, ¶17; Exhibit 3.  According to Johnson, "This usually occurs when he is sitting and generally lasts only a few minutes at the longest." Hanvey Affidavit, ¶17; Wallinga Affidavit, ¶17; Exhibit 3.  He told Health Services that "He has not noticed any pain when he is active."  Hanvey Affidavit, ¶18; Wallinga Affidavit, ¶18; Exhibit 3.  Health Services, therefore, directed Johnson to "Increase his activity in order to hopefully improve the cramping in his right calf." Hanvey Affidavit, ¶18; Wallinga Affidavit, ¶18; Exhibit 3.

A review of his medical records reflects that Johnson was again later seen by Health Services on December 27, 2016 and inquired about "What orders and report did therapist write allowed cancelling my treatment."  Hanvey Affidavit, ¶19; Wallinga Affidavit, ¶19; Exhibit 4.  When Nursing Staff indicated that they were not sure what he was referring to, Johnson stated "My physical therapist told me last time that I should do these home exercises."  Hanvey Affidavit, ¶19; Wallinga Affidavit, ¶19; Exhibit 4.  According to Johnson, "Deb on the Unit says I have an order that says I should be walking more."  Hanvey Affidavit, ¶20; Wallinga Affidavit, ¶20; Exhibit 4.  Johnson, "pointing to his New Balance shoes on his feet," told Health Services "That's why I got these shoes."  Hanvey Affidavit, ¶20; Wallinga Affidavit, ¶20; Exhibit 4.  Health Services informed Johnson that while "there is not an official order in his chart to print him a copy," this "may have been medically recommended previously at some point." Hanvey Affidavit, ¶21; Wallinga Affidavit, ¶21; Exhibit 4.  In response thereto, Johnson stated "That makes sense."  Hanvey Affidavit, ¶21; Wallinga Affidavit, ¶21; Exhibit 4.

Johnson, when examined on June 22, 2017, was said to have "normal movement of all 4 extremities."  Hanvey Affidavit, ¶22; Wallinga Affidavit, ¶22; Exhibit 5.  Muscle strength was "appropriate and symmetrical" and "sensation is normal." Hanvey Affidavit, ¶22; Wallinga Affidavit, ¶22; Exhibit 5. Johnson, on September 28, 2017, was said to "continue to use a wheelchair for any distances at Mike Durfee" due to "impaired balance and chronic leg weakness." Hanvey Affidavit, ¶23; Wallinga Affidavit, ¶23; Exhibit 6.  On January 9, 2018,

Health Services received a "Kite" from Johnson "Regarding needing a copy of medical order for shoes." Hanvey Affidavit, ¶24; Wallinga Affidavit, ¶24; Exhibit 7. In response thereto, Health Services "Instructed him per his Unit Staff, New Balance shoes were ordered for him and currently back-ordered." Hanvey Affidavit, ¶24; Wallinga Affidavit, ¶24; Exhibit 7. As indicated elsewhere herein, Johnson readily acknowledged that he was told that he "should be walking more and that's why I got these shoes." Hanvey Affidavit, ¶25; Wallinga Affidavit, ¶25; Exhibit 4. If Johnson was not able to be "walking more," there would have been no need for him to have requested another pair of special shoes.

The record reflects that Johnson was still able to walk in 2018. When seen by Health Services on July 20, 2018, Johnson indicated that, while his COPD "has been fairly stable," he has "more difficulty with the hot, humid days." Hanvey Affidavit, ¶29; Wallinga Affidavit, ¶29; Exhibit 9. Johnson maintained that he "noticed shortness of breath with exertion." Hanvey Affidavit, ¶29; Wallinga Affidavit, ¶29; Exhibit 9. The record, therefore, again reflects that "He does use a wheelchair for any distances traveled." Hanvey Affidavit, ¶29; Wallinga Affidavit, ¶29; Exhibit 9. When later seen on November 2, 2018, Johnson complained of "shortness of breath on and off over the past 3 weeks." Hanvey Affidavit, ¶30; Wallinga Affidavit, ¶30; Exhibit 10. While indicating that he "noted good improvement" when treated with "Protocol Mucinex," Johnson told Health Services that he "never had complete resolution of symptoms." Hanvey Affidavit, ¶30; Wallinga Affidavit, ¶30; Exhibit 10. In

response to Johnson's complaint(s) of "feeling short of breath while taking a shower and with walking," Health Services ordered a "CXR to rule out pneumonia." Hanvey Affidavit, ¶31; Wallinga Affidavit, ¶31; Exhibit 10. The record therefore reflects that Johnson is more than able to walk if/when he wants to.

On November 3, 2018, Johnson was said to be "shivering/shaking" when he reported to Health Services. Hanvey Affidavit, ¶32; Wallinga Affidavit, ¶32; Exhibit 11. He also "appears to be sluggish and slow response to questions." Hanvey Affidavit, ¶32; Wallinga Affidavit, ¶32; Exhibit 11. When "Patient seems to get confused and responds to questions incorrectly," a verbal order was obtained to "send patient to ASHH [Avera Sacred Heart Hospital] ER via ambulance." Hanvey Affidavit, ¶32; Wallinga Affidavit, ¶32; Exhibit 11. Johnson was later "Diagnosed with pneumonia" and it was thought that he would "likely remain in the hospital for a few days." Hanvey Affidavit, ¶33; Wallinga Affidavit, ¶33; Exhibit 12.

Following his discharge from the hospital, Johnson was housed in the infirmary at the MDSP. At the time in question, his breathing was "non-labored." Hanvey Affidavit, ¶34; Wallinga Affidavit, ¶34; Exhibit 13. There were "No complaints of pain or discomfort" and Johnson "stood right up and transferred himself into bed." Hanvey Affidavit, ¶34; Wallinga Affidavit, ¶34; Exhibit 13. He was, later during the morning of November 8, 2018, again said to be "breathing easily and in no distress." Hanvey Affidavit, ¶35; Wallinga Affidavit, ¶35; Exhibit 13. Johnson was "Able to stand up, transfer and change

his clothes with no problems." Hanvey Affidavit, ¶35; Wallinga Affidavit, ¶35; Exhibit 13. He was therefore allowed to return to his Unit.  Hanvey Affidavit, ¶35; Wallinga Affidavit, ¶35; Exhibit 13.

The record reflects that Johnson was, on July 11, 2019, recently seen by Health Services at the MDSP for a Chronic Care appointment.  At that time, Johnson "states he is doing quite well with his chronic problems."  Hanvey Affidavit, ¶36; Wallinga Affidavit, ¶36; Exhibit 18.  According to his medical records, Johnson "moves all 4 extremities well."  He was "able to get from sitting to standing without any assistance."  Hanvey Affidavit, ¶37; Wallinga Affidavit, ¶37; Exhibit 18.  Johnson, therefore, was also "able to get out of his wheelchair and onto the exam table without any assistance." Hanvey Affidavit, ¶37; Wallinga Affidavit, ¶37; Exhibit 18.  Although it was said that Johnson "does appear quite unsteady and reaches for objects … in order to stabilize himself," a review of his medical records indicates that he was "able to walk across the exam room, turn around, and return without assistance" to his wheelchair.  Hanvey Affidavit, ¶38; Wallinga Affidavit, ¶38; Exhibit 18.

Health Services thus undertook to discuss with Johnson "the need for him to exercise now and post discharge." Hanvey Affidavit, ¶39; Wallinga Affidavit, ¶39; Exhibit 18. Johnson was said to have "voice[d] understanding and agreement with this plan."  Hanvey Affidavit, ¶39; Wallinga Affidavit, ¶39; Exhibit 18.  In order to aid Johnson with his "impaired balance and unsteadiness on his feet when ambulating, Health Service recommended that

he "should use either a front-wheeled or 4 wheeled-walker for ambulating assistance."  Hanvey Affidavit, ¶40; Wallinga Affidavit, ¶40; Exhibit 18.

Officials at the MDSP also recently received a "Kite-Request Slip" from Johnson, dated July 20, 2019, wherein he indicated that he had "called the A.D.A."  Reyes Affidavit, ¶52, Exhibit 20.  Johnson was unhappy with the decision of the Parole Board to reject his Parole Release Plan which included his desire to reside at an apartment building where he would have to "do 3 steps to get to [his] floor."  Reyes Affidavit, ¶52; Exhibit 20.  The Parole Board did not approve such living arrangements due to Johnson's previous complaints that he was disabled and therefore not able to walk.  Johnson, however, indicated that he had been able to "do steps for years to shower and visit."  Reyes Affidavit, ¶53; Exhibit 20.  When Johnson later met with prison officials, he again indicated that he was more than able to climb stairs.  Reyes Affidavit, ¶54.  Johnson's attempts to persuade this Court that he is disabled and not able to get out of his wheelchair and walk are therefore nothing short of absurd.

Based on the above, it readily appears that Johnson is still not confined to a wheelchair.  Hanvey Affidavit, ¶6; Wallinga Affidavit, ¶6.  While Johnson does continue to use a wheelchair for "any distance traveled at MDSP," a review of his medical records reflects that he can and does walk.  Hanvey Affidavit, ¶11, ¶14; Wallinga Affidavit, ¶11.  In fact, as indicated elsewhere herein, Johnson has been directed that he "should be walking more" so that he "can be more ambulatory with less dependence on his wheelchair."  Hanvey Affidavit,

¶25; Wallinga Affidavit, ¶25; Exhibits 1, 4.  He was again recently advised, on July 11, 2019, of the "need for him to exercise."  Hanvey Affidavit, ¶39; Wallinga Affidavit, ¶39; Exhibit 18.

Defendants therefore would, once again, respectfully submit that, as in *Rickmyer,* 2016 WL 1248677, at *4, the record reflects that Johnson is not completely unable to walk.  While he may experience difficulty with walking "any distance traveled," any such "moderate limitations" do not suffice to rise to the level of a "disability" for purposes of the ADA. *Id; Higdon v Chrysler Group, Inc.,* 2011 WL 6740424 at *6 (E.D. Mo.); *Ponder,* 2010 WL 4868080, at *9.  Since Johnson has not satisfied the first element of establishing an actual "disability," he is not entitled to the protections afforded under the ADA. *Johnson v. Robert McDonald Sec'y Dept. of Veterans Affairs,* 2016 WL 5870061, at *3 (E.D. Mo).  Johnson's Complaint, therefore, fails to state a claim under Title II and must thus be dismissed by the Court.  Even if it could be said, for sake of argument, that Johnson is a "qualified individual with a disability," he still has not, as will be shown below, established that he was "excluded from participation in or denied the benefits of the [prison's] services, programs, or activities" or "otherwise subjected to discrimination by the [prison]." *Baribeau,* 596 F.3d at 484.

## RELIGIOUS ACTIVITIES

There is not merit whatsoever to the allegations by Johnson that he has been "discriminated against by the Defendants when he attends religious activities by making him sit in the rain, snow or sub-zero conditions, until all

other inmates are counted."  Doc. 9, p.40, ¶1.[2]  The record reflects that Johnson has, while housed at the MDSP, filed numerous grievances complaining that "having to wait until everyone is counted impedes [his] ability to attend religious services."  Doc. 9-1, pp. 245-249; Doc. 9-2, pp. 250-265. According to Johnson, "Singling [him] out and forcing [him] to wait while officers counted the ambulatory persons and allowed them to continue on into the Chapel Service" was a "blatant 8th Amendment violation and a [sic] act of cruel and unusual punishment."  Doc. 9-2, p. 256.  He further maintains that this was "A deliberate act of discrimination and a violation of equal protection clause of the Fourteenth Amendment."  Johnson's current ADA Complaint is premised on nothing more than his insistence that he be allowed to "proceed into the service ahead of the main body."  Doc. 9-2, p. 259.

Despite Johnson's apparent beliefs to the contrary, the ADA only requires that prisons provide inmates with "reasonable accommodations." Defendants are not required to provide the "specific accommodations sought by the prisoner."  *Cade v. Williams,* 2014 WL 5529743, at *2 (E.D. Ark.) (citing *Mason v. Corr. Med. Serv. Inc.,* 559 F.3d 880, 886 (8th Cir. 2009)).  It is also well established that "The right to reasonable accommodations is not absolute." *Maxwell v. Olmstead County,* 2012 WL 466179, at *3 (Minn.); *Stebbins v. Boone*

---

[2] Although Johnson now wants this Court to believe that he was forced to "sit in the rain, snow or sub-zero conditions" when attending religious services, his own documents, submitted along with his Complaint, seem to refute any such assertion.  As indicated therein, Johnson generally "sat in the chair lift" while waiting for officers to count the other inmates attending the religious services. Doc. 9-2, p. 250; Doc. 9-2, p. 253; Doc. 9-2, p. 256; Doc. 9-2, p. 258; Doc. 9-2, pp. 262-263.

*County, Ark.,* 2015 WL 1457229, at *16 (W.D. Ark.); *Brown v. Houston,* 2018
WL 1309833, at *8 (Neb.).  It has been said, on repeated occasions, that
"correctional facilities are not liable for failing to provide accommodations
which were not requested, nor are they required to provide preferential
treatment to inmates." *Maxwell,* 2012 WL 466179, at *3 (citing *Randolph v.
Rodgers,* 170 F.3d 850, 858 (8th Cir. 1999); *Stebbins,* 2015 WL 1457229 at
*16; *Brown,* 2018 WL 1309833, at *7.  As was aptly stated in *Wright v. Wood,*
2009 WL 3153321, at *4, (W.D. Mo.), "Although some special accommodation
for each prisoner's individual needs may be desirable in the best of worlds, it is
not mandated by the ADA or the Constitution."  According to the court, "it is
often not feasible given a . . . prison's limited flexibility and resources." *Id.*

Here, the record readily reflects that Defendants undertook to provide
Johnson with "reasonable accommodations" in order to enable him to attend
scheduled religious activities.  There is undisputed evidence in the record that
a chair lift was previously in place at the MDSP for "access to the second floor"
of the Student Union.  Doc. 9-7, pp. 115-117.  There was also a "ramp in place
for access to the basement of the Student Union."  The record reflects that "The
front door is accessible and a lift carries the inmate up.  There is a ramp in the
back for access to the basement for services."  Doc. 9-7, p. 115.  As indicated
in an Administrative Remedy Response dated November 4, 2016, "If one entry
point is not operational, activities will be moved to the library." Doc. 9-7,
p.117.

Johnson also readily acknowledges that, in a further attempt to accommodate his requests to attend religious services, staff at the MDSP were "directed to call wheelchair inmates 10 minutes prior to the large group." Doc.9-2, p 259; Doc. 9-2, p. 265. As indicated in a letter to Johnson dated October 28, 2016, "Wheelchair inmates are called first." Doc. 9-2, p. 261. A review of the documents/exhibits filed by Johnson reflect that he was "dismissed first and assisted into the services. Accommodations were made." Doc. 9-2, p. 252. Johnson's own exhibits reflect that he was "Assisted to the service prior to the service starting." Doc. 9-2, p. 261.

There has therefore been no showing by Johnson that he was frequently excluded from participating in religious services due to his alleged disability. Fluke Affidavit, ¶18. The burden is on Johnson to demonstrate that the right to practice his religion was denied. *Vick v. Core Civic,* 329 F.Supp.3d 426, 453 (Tenn. 2018). Here, Johnson has not and cannot satisfy that burden. As in *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 443 (N.Y. 2004), Johnson does not allege that he was prohibited altogether from accessing religious services. *See also Atkins v. County of Orange,* 251 F.Supp.2d 1225, 1232 (S.D.N.Y 20003). "Indeed, the Complaint concedes that plaintiff was able to access [Student Union] on several occasions." *Id.* Johnson's complaint is simply that he was made to wait while "other inmates [were] counted into the activity." Doc. 9, p. 40, ¶1. Defendants would submit that the fact that Johnson's access to the chair lift made it more difficult for him to attend

religious services is not tantamount to stating a claim of exclusion or discrimination.  *Burgess v. Goord,* 1999 WL 33458, at * 7 (S.D.N.Y).

Finally, any purported claim that Johnson may have had regarding his having been made to sit in the chair lift until all other inmates had been counted has since been rendered moot.  As indicated in the various affidavits attached hereto, the chair lift previously located near the "Old Chapel" in the Student Union Building at the MDSP has been removed and is no longer in use.  Caruana Affidavit, ¶7; Fluke Affidavit, ¶19.  In the past, the chair lift had been the subject of repeated acts of vandalism.  Said vandalism led, in part, to the decision to remove the chair lift.  Caruana Affidavit, ¶8; Fluke Affidavit, ¶20.  All religious services have now been moved to either the "New Chapel" located in the Library or the Armory at the MDSP.  Caruana Affidavit, ¶9; Fluke Affidavit, ¶21.  Both buildings are handicapped accessible.  Caruana Affidavit, ¶9; Fluke Affidavit, ¶21.  Johnson, therefore, is afforded ample opportunity to attend religious services.  Caruana Affidavit, ¶10; Fluke Affidavit, ¶22.

As noted in *Pierce v. County of Orange,* 526 F.3d 1190, 1215 (9th Cir. 2008), "A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance."  It was said that, "The regulations allow public entities to use a variety of methods to make existing facilities 'readily accessible,' including the 'reassignment of services to accessible buildings.'"  *Id.* (citing 28 C.F.R. § 35.150(B)(1)).  *See also Cohen v. City of Culver City,* 754 F.3d 690, 696 (9th Cir. 2014); *Babcock v. Michigan,* 812 F.3d 532, 536 (6th Cir. 2016); *Mote v. City of Chelsea,* 252

F.Supp.3d 642, 651 (D. Mich. 2017).  It is thus well established that public entities may comply with the ADA by relocating services, programs and activities from inaccessible to accessible facilities.  *Babcock,* 812 F.3d at 536.

It has been said that "A defendant's voluntary removal of alleged barriers prior to trial can have the effect of mooting a plaintiff's ADA claim."  *Lindsay v. 1777 Westwood Limited Partnership,* 2018 WL 4006425, at *2 (D. Cal.) (citing *Oliver v. Ralphs Grocery Co.,* 654 F.3d 903, 905 (9th Cir. 2011)).  As therefore noted in *Boitnott v. Border Foods, Inc.,* 361 F.Supp.3d 858, 865 (Minn. 2019), "ADA claims are moot when a defendant has presented evidence that modifications to its property have remedied the ADA violations identified in the complaint."  Inasmuch as Johnson now has ready access to the religious services being held in the "New Chapel" located in the Library at the MDSP, his claim that Defendants have refused to provide him access to religious services must therefore be dismissed.

## OBSTRUCTION OF SIDEWALKS / HALLWAYS

Also, without merit is the assertion by Johnson that Defendants "violated the ADA when they attempted to alleviate the overcrowding of the handicap bathroom."  Doc. 9, p. 41, ¶3.  According to Johnson, he was "subjected to obstruction of sidewalks, during the construction that was being done by the Defendants."  Doc. 9, p. 41, ¶4.  Johnson also complains that Defendants refused to "maintain and provide an 'accessible route' when, during the remodeling of the General Population bathroom," they "allowed the placement

22

of two (2) 55-gallon trash cans and a shower chair to be placed in the hallway."
Doc. 9, p. 43, ¶9.

A review of the record reflects that Johnson, in response to a Kite-
Request Slip dated October 14, 2016, was informed that "sidewalks are being
repaired that were tore up from construction."  Doc. 9-8, pp. 125-126.
Johnson was further advised, in an Informal Resolution Response dated
November 2, 2016, that, despite his assertions to the contrary, "Egress or
regress is not being prohibited to travel within hallway."  Doc. 9-16, p. 163.  As
indicated in a subsequent Administrative Remedy Response dated
November 16, 2016, "Unit Staff reported that the garbage cans did not hinder
access to the area."  Doc. 9-16, p. 166.  Moreover, the record reflects that "The
construction work in the first-floor bathroom has been completed and the
items have been moved back to their original place."  Doc. 9-16, p. 166.

A similar argument was rejected in *Schoenfeld v. City of Carlsbad,* 978
F.Supp.1329,1339 (S.D. Cal. 1997) *aff'd.* 172 F.3d 876 (9th Cir. 1999), where
the court found that defendants could "compel disabled persons to travel a
'marginally longer route' under some circumstances, as long as its programs
were still accessible as a whole."  *Cohen v. City of Culver City,* 754 F.3d 690,
697 (9th Cir. 2014) (citing *Schoenfeld,* 978 F.Supp. at 1339).  According to the
court, "Plaintiffs' evidence was insufficient to create a genuine dispute of
material fact as to whether Carlsbad had denied them access to a public
service under the ADA."  *Id.* (citing *Schoenfeld,* 978 F.Supp. at 1341).
Summary judgment was thus granted in defendant's favor.  As in *Schoenfeld,*

23

the affidavits attached hereto establish that there was "never a time when access by one route or another would have been compromised." Caruana Affidavit, ¶16; Fluke Affidavit, ¶31. There were alternate routes available to Johnson while the sidewalk in question was torn up due to the construction involving the General Population bathroom. Caruana Affidavit, ¶16; Fluke Affidavit, ¶31. Defendants, therefore, would assert that programs, as-a-whole, were thus still accessible to Johnson. Caruana Affidavit, ¶17; Fluke Affidavit, ¶32.

Moreover, it is well settled that "The ADA applies to architectural barriers, not temporary or removable obstructions." *Crandall v. Starbucks Corporation,* 249 F.Supp.3d 1087, 1112 (N.D. Cal 2017); *Kirola v. City & County of San Francisco,* 74 F.Supp.3d 1187 (N.D. Cal, 2014) (citing *Sharp v. Islands Restaurant Carlsbad,* 900 F.Supp.2d 1114, 1126 (S.D. Cal. 2012)). As was thus recognized in *Crandall,* 249 F.Supp.3d at 1110, "ADA regulations explain that the requirement that public accommodations maintain 'ready accessible' facilities and equipment does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs." In finding that "An isolated or temporary hindrance to access does not give rise to a claim under the ADA," the court referred to and relied on 28 C.F.R. § 36.211(B). *Crandall,* 249 F.Supp.3d at 1110. As expressly provided therein, "This section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs." Identical language can also be found in 28 C.F.R. § 35.133.

A similar result was also reached in *Hillesheim v. Myron's Cards & Gifts, Inc.,* 897 F.3d 953, 956 (8th Cir. 2018) where the court found that "In addition to maintenance and repairs, 28 C.F.R. § 36.211(B) permits 'a temporary interruption that blocks an accessible route.'" It was said that "If the items are placed there temporarily . . . then § 36.211(B) excuses such 'isolated or temporary interruptions.'" *Hillesheim,* 897 F.3d at 956. Here, as already indicated elsewhere herein, it is undisputed that "The construction work in the first-floor bathroom has been completed and the items have been moved back to their original place." Doc. 9-16, p. 166. Defendants, therefore, would submit that said temporary obstructions did not, despite Johnson's apparent beliefs to the contrary, violate the ADA.

## URINAL IN GENERAL POPULATION BATHROOM

Johnson also complains that "The urinal in the General Population Bathroom is not in compliance with the ADA." Doc. 9, p. 41. ¶5. According to Johnson, "It is because of the Defendants' actions or refusal to bring the urinal into said compliance, the Defendants cause undue harm and injury to the Plaintiff in the sum of one million dollars $1,000,000.00." Johnson, however, readily acknowledges that there is a handicapped bathroom in place in his Housing Unit. Doc. 9, p. 41, ¶3; Doc. 9-5, p. 80.[3] There is, in addition to the

---

[3] Johnson wants this Court to believe that "Unit Staff went as far as claiming that Plaintiff was not handicap enough to use the regular handicap toilet." Doc. 9, p. 41, ¶3. These allegations will be addressed in greater detail in that portion/section of Defendants' Brief regarding alleged retaliation under Title V.

handicapped bathroom in Harmon Hall, also a "handicapped toilet in the general population restroom for [Johnson's] use." Doc. 9-5, p. 79.[4]

Despite Johnson's apparent beliefs to the contrary, "The ADA does not require every element of a place of public accommodation to be accessible." *Lindsay,* 2018 WL 4006425, at *3 (citing *Long v. Coast Resorts, Inc.,* 32 F.Supp.2d 1203, 1212 (Nev. 1998) *aff'd in part, rev'd in part,* 267 F.3d 918 (9th Cir. 2001)). *See also Harris v. Costco Wholesale Corp.,* 389 F. Supp.2d 1244, 1250 (Cal. 2005). It has therefore been said that "Every stall in every bathroom is not required to accommodate wheelchairs." *Lindsay,* 2018 WL 4006425, at *3; *Harris,* 389 F.Supp.2d at 1250. Defendants, therefore, would assert that the measures undertaken at the MDSP constitute "reasonable accommodations" under the ADA. *Garrett v. Thaler,* 560 Fed. Appx. 375, 383 (5th Cir. 2014).

Here, as in *Jones v. Sheahan,* 1999 WL 1024535, at *4 (N.D. Ill.), the facts also establish that Johnson was not denied access to the bathroom. Johnson, as in *Garrett,* 560 Fed. Appx. at 383, was able to request the use of

---

[4] A review of the record reflects that Johnson does not dispute that there is a "handicapped toilet" in the general population bathroom. He was insisting, however, that "the handicap stall in the General Population Bathroom in Harmon Hall be designated as handicap only." Doc. 9-4, p. 74; Doc. 9-4, p. 76. In response thereto, Johnson was told that "A stall in the general population bathroom was made handicapped accessible" but that "the general population is allowed to use it when there is not another stall available." Doc. 9-4, p. 77. As already indicated elsewhere herein, Defendants need only provide "reasonable accommodations." Johnson is not entitled to preferential treatment or the "specific accommodations sought by the prisoner." *Cade,* 2014 WL 5529743 at *2 (citing *Mason,* 559 F.3d at 886.

26

the handicap bathroom.  As noted by the court, "Prison is certainly not a place from where one can demand the luxury of comfort." *Id.* at *3.  According to the court, "The ADA does not provide a remedy for inconvenience." *Id.*  The fact, therefore, that Johnson may have had to wait to use the handicapped bathroom while other inmates were scheduled for showers did not rise to the level of an ADA violation.  Once again, the ADA requires only that prison officials make "reasonable accommodations," not those preferred by the inmate. *Maxwell,* 2012 WL 466179, at *3 (citing *Randolph,* 170 F.3d at 858.

Finally, the various affidavits attached hereto readily reflect that Johnson is more than capable of getting out of his wheelchair and standing.  Hanvey Affidavit, ¶41; Wallinga Affidavit, ¶41.  The record further reflects that Johnson is, albeit for short distances, able to walk.  There has therefore been no showing by Johnson that the height of the urinal in the General Population Bathroom prohibited him from using the same.  Hanvey Affidavit, ¶42; Wallinga Affidavit, ¶42.  Johnson has not and cannot show that his alleged "disability" in any way substantially limited or restricted his ability to use said urinal.

DESK/WRITING TABLE

According to Johnson, Defendants have also "refused to provide him a desk and/or writing table that meets the requirement as stated in the ADA regulations. § 504." Doc. 9, p. 44, ¶10.  As noted by Johnson, "The desk size provided must have a writing surface no higher than 34 inches to provide adequate knee and leg clearance, with a desired height of 30 inches of knee

width and 29 inches of knee height and 19 inches of leg depth."  Johnson

alleges that "My desk if [sic] 27½ inches high, 24 inches wide and leg depth is

not near to the required 19 inches."  Doc. 9, p. 44, ¶10.

The record reflects that Johnson, in an Informal Resolution Request

dated January 3, 2017, raised a similar complaint.  According to Johnson,

"Desks must be no higher than 34 inches, 30 inches of knee width, 29 inches

of knee height and 19 inches of depth."  Doc. 9-18, p. 173.  In response

thereto, Johnson was told that "A desk is within acceptable range – 28" – 34"."

Doc. 9-18, p. 174.  Subsequent thereto, Johnson, in an Administrative Remedy

Response dated February 6, 2017, was advised that all desks located in the

Housing Units were "in the acceptable height and width range."  Reyes

Affidavit, ¶36; Exhibit 17.  The record reflects that, in response to Johnson's

allegations, the desk/writing table in his Housing Unit was recently measured.

Eilers Affidavit, ¶6.  Said measurements indicate that the desk that Johnson is

currently using measures some 28½ inches high, 49¼" wide and 26" in depth.

Eilers Affidavit, ¶6. Johnson's allegation that his desk is "not near to the

required 19 inches" of depth is therefore without any merit. The above

measurements appear to be well within the Accessibility Guidelines adopted by

the DOJ.  Pursuant to those Guidelines, "knee space" must be at least 27"

high.  *See Dempsey v. Pistol Pete's Beef N Bar, LLC.,* 2010 WL 2674436, at *6

(D.N.J.); *Daubert v. City of Lindsay,* 2011 WL 2360900, at *6 (E.D. Cal.); (*Kalani

v. Avenue Grill, Inc.,* 2016 WL 5402709, at *4 (E.D. Cal.) ;(*Ridola v. Chao,* 2018

WL 2287668 at *9 (N.D. Cal.).

28

Moreover, as already indicated elsewhere herein, the MDSP was, on or about December 1, 2016, inspected by the DOJ for purposes of determining whether said facility was in compliance with the ADA. Fluke Affidavit, ¶5; Reyes Affidavit, ¶5. Defendants would respectfully ask that, as in *Maday v. Dooley,* Civ. #17-4268-KES, the Court, for "sake of a complete picture of the ADA at the MDSP," take judicial notice of the "comprehensive and far reaching Settlement Agreement entered into between the South Dakota Department of Corrections (SDDOC) and the United States Department of Justice (DOJ) on October 23, 2018." Report and Recommendation, March 8, 2019, Doc. 188, p.2611. As indicated in said Report and Recommendation, "This Agreement was based on on-site investigations by the DOJ of both MDSP and the South Dakota State Penitentiary (SDSP)." Doc. 188, p. 2611. The Settlement Agreement, therefore, "covers ADA enforcement at both prisons." *Id.*

A review of said Settlement Agreement reflects that "On December 1, 2016, DOJ representatives toured MDSP." As part of said inspection, the DOJ identified various "architectural issues" at the MDSP that were said to be in need of remedial action. Fluke Affidavit, ¶6; Reyes Affidavit, ¶40. The agreed upon "accessibility modifications to MDSP" were specified or set out in "Attachment B" referred to in said Settlement Agreement. Reyes Affidavit, ¶41; Fluke Affidavit, ¶39; Exhibit 16. Attachment B reflects that during its inspection of the MDSP, the DOJ determined, inter alia, that the top of the circulation counter located in the Library was "40 inches above the finished floor." Reyes Affidavit, ¶42; Fluke Affidavit, ¶41. The SDDOC thereafter agreed

to "Provide a counter on accessible routes such that each counter has a portion extending the same depth as the counter top and no more than 36 inches high." Reyes Affidavit, ¶43; Fluke Affidavit, ¶42. A review of Attachment B, again referred to in the Settlement Agreement, reflects that no violations were noted or detected by the DOJ in connection with the "desks and/or writing tables" located in the various Housing Units at the MDSP. Reyes Affidavit, ¶44; Fluke Affidavit, ¶43.[5]

Defendants, therefore, would assert that, despite Johnson's allegations to the contrary, there is nothing in the record to suggest that they have refused to provide him a desk and/or writing table that meets the requirement as stated in the ADA regulations. § 504. As indicated elsewhere herein, "The United

---

[5] The same is true regarding the allegations by Johnson that Defendants "refuse to require the phone cords be a length that is specified within the ADA." Doc. 9, p 43, ¶9. There is nothing in Attachment B to the Settlement Agreement which would even remotely indicate that "the cords on the phone here at the Prison measure considerably less then [sic] the required 29 inches." The only "violation" noted therein by the DOJ during its inspection of the MDSP involved the lack of accessible inmate telephones inside the gym. Reyes Affidavit, ¶47; Fluke Affidavit, ¶45. Officials, therefore, agreed to provide an accessible telephone "mounted between 15 and 48 inches high" with a cord "at least 29 inches long from the telephone to the handset." Reyes Affidavit, ¶48; Fluke Affidavit, ¶46. Prior thereto, officials at the MDSP, in response to Johnson's complaints regarding the length of the telephone cords, undertook to lower one of the telephones located in Harmon Hall in order to be ADA compliant for inmates in wheelchairs. Christensen Affidavit, ¶14.

There has also been no showing by Johnson that he is unable to stand for a brief period of time in order to use the "phone[s] here at the Prison." Hanvey Affidavit, ¶43; Wallinga Affidavit, ¶43. Moreover, inmates at the MDSP are now capable of placing a telephone call using the electronic tablets recently provided to all inmates at said facility. Fluke Affidavit, ¶49. Johnson, therefore, has not and cannot show that he was denied the use of a telephone due to his use of a wheelchair.

States is authorized under 28 C.F.R. Part 35, Subpart F, to investigate complaints alleging these facilities' compliance with Title II of the ADA." Reyes Affidavit, ¶4; Exhibit 16. It is also well established that the DOJ has the right to ensure compliance through site inspections. *Gropper v. Fine Arts Housing, Inc.,* 12 F.Supp.3d 664, 667 (S.D.N.Y. 2014). The DOJ, as provided for in the Settlement Agreement reached on or about October 23, 2018, is further authorized to "issue findings, and, where appropriate, to negotiate and secure voluntary compliance agreements." Reyes Affidavit, ¶45; Exhibit 16. Here, there were no findings issued by the DOJ which would indicate, in any way, that the "desk and/or writing table" provided Johnson is in violation of the ADA.

RUBBER MAT

Finally, there is also no merit whatsoever to the assertion by Johnson that Defendants "cause undue stress and harm on him by placing a rubber mat in front of the ice/hot water machine." Doc. 9, p. 42, ¶6.[6] The record reflects that Johnson, in an Informal Resolution Request dated February 14, 2017, indicated that he "want[ed] the rubber mat that's on the floor in front of the ice and water dispenser removed as it is a hazard to [his] wheelchair." Doc. 9-10, p. 132. In response thereto, Johnson was advised, in an Informal Resolution Response dated February 21, 2017, that "Mat is within

---

[6] There has, for quite some time, been a rubber mat placed in front of the ice machine. Reyes Affidavit, ¶53; Christensen Affidavit, ¶17. Said mat was intended to protect all inmates from slipping on the ice/water. Reyes Affidavit, ¶53; Christensen Affidavit, ¶17.

specifications of ADA Guidelines for changes in level." Doc. 9-10, p. 131. Johnson was also later informed, in an Administrative Remedy Response dated March 3, 2017, that "Floor and ground surfaces shall be stable, firm and slip resistant and up to a ¼ inch in height with a beveled edge at a sloped ratio of 1:2." Doc. 9-10, p. 134.  As indicated therein, "The mat meets these qualifications." Doc. 9-10, p. 134.

It is well established that "The ADA does not require accessible routes to be perfectly flat everywhere." *Assoc. for Disabled Americans, Inc. v. Key Largo Bay Beach, LLC,* 407 F.Supp.2d 1321, 1344 (Fla. 2005).  As noted therein, "ADAAG 4.52 specifically addresses 'changes in level' occurring in an accessible route and states that changes in level up to ¼ inch may be perfectly vertical without any edge treatment whatsoever." *Id.*  It has been said that "Changes in level between ¼ inch and ½ inch are also allowed, provided they are beveled with a slope no greater than 1:2 or 50%." *Id.  See also Wilson v. Pier 1 Imports (US), Inc.,* 439 F.Supp.2d 1054, 1070, N. 10 (E.D. Cal. 2006); *Moore v. Chase, Inc.,* 2016 WL 866121, at *7 (E.D. Cal); *Khan v. KIR Tampa 003, LLC* 2015 WL 8207813, at *12 (Fla.).

There has also been no showing whatsoever by Johnson that placing a rubber mat in front of the ice/hot water machine has caused him undue hardship and injury. [7]  The affidavits on file with the Court reflect that

---

[7] As already indicated elsewhere herein, Johnson is more than capable of standing and walking short distances.  Hanvey Affidavit, ¶41; Wallinga Affidavit, ¶41.  Thee is nothing, from a medical standpoint, which would have

(continued. . .)

Associate Warden (AW) Reyes met with Johnson's Unit Manager, Nancy Christensen, to discuss the concerns expressed by Johnson regarding the mat place in front of the ice machine.  Reyes Affidavit, ¶57; Christensen Affidavit, ¶21.  While in Harmon Hall, both Reyes and Christensen "observed Johnson roll his wheelchair onto the mat in order to retrieve water and ice."  Reyes Affidavit, ¶57; Christensen Affidavit, ¶22.  Johnson appeared to have had no difficulty at all in rolling his wheelchair onto the mat.  Reyes Affidavit, ¶58; Christensen Affidavit, ¶22.  AW Reyes thereafter approached Johnson and asked him what issues/concerns he was having regarding the mat.  Based on their conversation, AW Reyes "turned the mat 90 degrees" and asked Johnson "If this would work."  Reyes Affidavit, ¶59; Christensen Affidavit, ¶23.  In response thereto, Johnson "Agreed that it was fine."  Reyes Affidavit, ¶60; Christensen Affidavit, ¶24.  It is thus absurd for Johnson to now suggest that Defendants' placement of a rubber mat in front of the ice machine has caused him "undue hardship and injury."

TITLE V - ALLEGED RETALIATION

Johnson, as noted by the Court in its Order dated March 22, 2018, also alleges that Defendants have retaliated against him after he filed ADA complaints.  Doc. 20, p. 328.[8]  "One example of this retaliation," according to

_____

(. . .continued)
prevented Johnson from standing up in order to use the ice/hot water machine.

[8] As further noted by the Court, "Johnson's Title V claim implicates Eleventh Amendment immunity."  Doc. 20, p. 333.  Although neither the Supreme Court nor the Eighth Circuit has decided whether Title V abrogates a State's Eleventh

(continued. . .)

Johnson, occurred when Defendants "ordered the removal of protruding items from the handicap bathroom."  Doc. 9, p. 40, ¶2.  "In a second instance of [alleged] retaliation," Johnson contends that Unit Staff "went so far as claiming that Plaintiff was not handicap enough to use the regular handicap toilet, sink, mirror and anything else in the regular handicap bathroom."  Doc. 9, p. 41, ¶3; Doc. 20, p. 329.  As noted by the Court, Johnson, "In a third instance," alleges that he "suffered direct attacks (verbal) by one of the Defendant's [sic]."  Doc. 9, p. 43, ¶8; Doc. 20, p. 329.

Johnson, however, to succeed on a claim of retaliation under Title V, must establish that (1) he engaged in statutorily protected activity; (2) adverse action was taken against him; and (3) a causal connection exists between the "adverse action" and "protected activity." *Stewart v. Independent Sch. Dist. No. 196,* 481 F.3d 1034, 1043 (8th Cir. 2007).  *See also Riggs,* 2019 WL 1441205, at *12 (citing *Hill v. Walker,* 737 F.3d 1209, 1218 (8th Cir. 2013)).

Defendants would assert that "A retaliation claim under the ADA ... requires a 'but-for' causal connection."  *Riggs,* 2019 WL 1441205, at *14 (citing

_____

(. . .continued)

Amendment immunity, other courts, as noted in the Order dated March 22, 2018, "have interpreted the Supreme Court's holding in *Bd. of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 360 (2001), as necessarily applying to retaliation claims arising out of Title V claims." Doc. 20, p. 333. According to the Court, "other courts have held that Title V does not provide for individual liability." *Spiegel v. Schulmann,* 604 F.3d 72, 79 (2nd Cir. 2010); *Baird v. Rose,* 192 F.3d 462, 472 (4th Cir. 1999). As recently found in *Riggs,* 2019 WL 1441205, at *13, "compensatory and punitive damages are not available on retaliation claims brought under 42 U.S.C. §12203." The Court, therefore, properly dismissed Defendants in their individual capacities. Doc. 20, p. 334

*Ochmke v. Medtronic, Inc.,* 844 F.3d 748, 758 (8th Cir. 2016)).  An ADA retaliation claim thus "follows the same direct evidence of burden-shifting analysis employed in discrimination claims."  *Id.* (citing *EEOC V. Product Fabricators, Inc.,* 763 F.3d 963, 972 (8th Cir. 2014)).  As therefore noted in *Riggs,* "The defense can rebut a retaliation claim by showing a 'non-retaliatory reason for the adverse ... action.'"  *Id.* (citing *Green v. Franklin National Bank of Minneapolis,* 459 F.3d 903, 914 (8th Cir. 2006)).  "If the defendant can show a legitimate reason, the plaintiff must show that the given reason was only a pretext for discrimination."  *Id.*  *See also Johnson v. City of Blaine,* 970 F.Supp.2d 893, 916 (Minn. 2013)).

## PROTECTED ACTIVITY

Defendants would assert that, despite his apparent beliefs to the contrary, Johnson was not engaged in "statutorily protected activity" and therefore has not/cannot establish the first element of a retaliation claim under Title V. As indicated in *Riggs,* 2019 WL 1441205, at *14, Johnson is "required to make a *prima facie* showing that he was engaged in a proceeding under the retaliation provision of the ADA."  *Green,* 459 F.3d at 914.  In its Order dated March 29, 2019, the Court, citing to *Amir v. St. Louis University,* 184 F.3d 1017, 1035 (8th Cir. 1999), found that "filing such [] grievance[s] is a protected activity under the ADA as long as [Johnson] had a reasonable, good faith belief in the allegations contained in the grievance."  Doc. 42, p. 548.  Johnson, therefore, must establish that he "had a good faith belief that. . . [his] accommodation [request] was appropriate."  *Riggs,* 2019 WL 1441205 at *21

(citing *Heilser v. Metropolitan Council,* 339 F.3d 622, 632 (8th Cir. 2003); *Hill v. Walker,* 737 F.3d 1209, 1218 (8th Cir. 2013).

In the instant case, this Court has already found that "the filing by Johnson of ADA grievances in close proximity in time to the circuit court's decision is pertinent to the question of whether Johnson possessed a reasonable, good faith belief in the allegations contained in his grievances." Doc. 42, p. 538. At the time that Johnson filed said grievances, the State Court had "legally determined that he was not 'disabled' for purposed of the ADA." Doc. 42, p.542. Moreover, Defendants would submit that a review of the record reflects that Johnson's own behavior at the time in question demonstrates that he lacked a "good faith" belief that his requested accommodations were warranted.

As already indicated elsewhere herein, when seen by Health Services on November 12, 2015, Johnson indicated that while he "does get short of breath and tired," he "attributes that more to being unable to exercise." Exhibit 1. The provider, therefore, "Encouraged more activity." Exhibit 1. In addition to submitting an Authorization Request for physical therapy, the provider suggested "An exercise plan for him so that he can be more ambulatory with less dependence on his wheelchair." Exhibit 1. The provider even went so far as to "recommend that he have improved footwear with possible insoles so that he would be able to ambulate more." Exhibit 1.

Johnson, when later seen by Health Services on May 12, 2016, acknowledged that he "does do some walking around on the Unit." Exhibit 2.

Subsequent thereto, on December 27, 2016, Johnson indicated to Health Services that "I have an order that states I should be walking more." Exhibit 4. According to Johnson, "That's why I got these shoes, pointing to the New Balance shoes on his feet." Exhibit 4. The record reflects that Johnson, as recently as January 9, 2018, was asking for a "copy of med order for shoes" so he could receive a new pair of special shoes. Exhibit 7. In response thereto, Johnson was advised that "New Balance shoes were ordered for him and currently backordered." Exhibit 7. Defendants would respectfully submit that if Johnson was confined to a wheelchair and unable to walk, there would be no need for him to have requested the New Balance shoes which, as indicated above, were issued to encourage/assist him in "walking more."

The record, therefore amply demonstrates that Johnson lacked a good faith belief that the accommodations he was requesting were appropriate. Since Johnson lacked a reasonable, good faith belief in the allegations contained in his grievances, he was not engaged in "protected activity" under the ADA. *Amir,* 184 F.3d at 1035. Defendants are thus entitled to summary judgment regarding Johnson's purported retaliation claims under Title V. Even if it could be said, for sake of argument, that Johnson was engaged in protected activity, Defendants would assert that he has not and cannot establish a "causal connection" between the adverse action and protected activity in order to succeed on his Title V claims. *Stewart,* 481 F.3d at 1043; *Hill,* 737 F.3d at 1218; *Riggs,* 2019 WL 1441205, at *12.

REMOVAL OF ITEMS FROM HANDICAP BATHROOM

A review of the record reflects that Johnson, in an Informal Resolution Request dated March 18, 2017, complained that Defendants "issued a order for the removal of protruding items from the handicap bathroom." Doc. 9-3, p. 69. As to the "23 or more protruding items," Johnson maintained that "only 3" were "convenient but very essential protruding items." He therefore insisted that Defendants "return the shelves, coat hooks and circulation fans to the handicap bathroom." Doc. 9-3, p. 69. In response thereto, Johnson was told that "The protruding items were removed per the United States Department of Justice." Doc. 9-3, p. 71.

Defendants are uncertain as to what "23 or more protruding items" Johnson is referring to. The protruding items, however, identified by the DOJ, set out in Attachment B referred to in the afore-mentioned Settlement Agreement entered into between the SDDOC and DOJ, included a "shelf in front of toilet" in the handicapped bathroom. Reyes Affidavit, ¶67; Fluke Affidavit, ¶50-51. It was said that "Unless protected by a cane detectable barrier, objects with their leading edges between 27 inches and 80 inches high shall not protrude into circulation paths more than 4 inches for wall mounted elements." Reyes Affidavit, ¶; Fluke Affidavit, ¶56. Similar concerns were expressed by the DOJ regarding the "fan over the lavatory." Reyes Affidavit, ¶69; Fluke Affidavit, ¶57. According to the DOJ, said fan was "70 inches above the lavatory" and therefore needed to be "protected by a cane detectable barrier." Reyes Affidavit, ¶69; Fluke Affidavit, ¶57. Officials at the MDSP were

38

given six (6) months in which to remove or remedy said violations found by the DOJ.  Reyes Affidavit, ¶70; Fluke Affidavit, ¶58.

Johnson, therefore, cannot establish a "but for" causal connection between the filing of his grievances and the removal of the protruding items from the bathroom.  *Riggs,* 2019 WL 1441205, at *14.  Defendants have clearly demonstrated a "non-retaliatory" reason for the removal of the items in question and have thus rebutted any claim of retaliation by Johnson.  *Id.* (citing *Green,* 459 F.3d at 914).  Johnson has not and cannot show that the legitimate reason offered by Defendants for the action in question was "only a pretext for discrimination." *Id.* (citing *Gilooly v. Mo. Dept. of Heath and Senior Services,* 421 F.3d 734, 739 (8th Cir. 2005)).

With regards to the "circulation fans" removed from the handicapped bathroom, Johnson also wants this court to believe that "The so-called exhaust fan in the handicapped bathroom is a fake."  Doc. 9, p. 42, ¶7.  According to Johnson, "It does nothing to eliminate the excessive humidity in the bathroom/shower" and "that type of environment is harmful to his health." Doc. 9, p. 42.   The record reflects that Johnson, in an Informal Resolution Request dated March 18, 2017, complained that the "fake exhaust fan" was "creating a very serious fire hazard" and insisted that it be removed to "eliminate any fire hazard."  Doc. 9-11, p. 138.  Johnson made no reference whatsoever therein to the alleged humidity supposedly "causing serious medical issues for him that are life threatening."  In response to his alleged concerns, Johnson was advised, in an Informal Resolution Response dated

March 23, 2017, that "The exhaust fan is cleaned regularly." Doc. 9-11, p. 137.

It was not until March 21, 2017 that Johnson, in an Informal Resolution Request, complained about the humidity and insisted that "SDDOC provide a means for air circulation in the handicap bathroom as an attempt to dissipate the sauna type atmosphere while showering." Doc. 9-14, pp. 152-153. Johnson was advised, in an Informal Resolution Response dated March 23, 2017, that "The current exhaust fan in the handicapped bathroom is operational." Doc. 9-14, p. 154. Johnson was also advised, in an Administrative Remedy Response dated May 26, 2917, that "The exhaust fan in the handicap bathroom provides a means of air circulation." Doc. 9-14, p. 156.

Johnson, nonetheless, when seen by Health Services on July 20, 2017, "with chief complaint of left scrotal swelling," complained that "The ventilation system in the Unit's bathroom is not removing the steam well enough." Hanvey Affidavit, ¶45; Exhibit 14. Although claiming that this was a "threat to [his] life," Johnson denied any shortness of breath or distress. Hanvey Affidavit, ¶47; Exhibit 14. Since Johnson denied any shortness of breath or distress, Health Services referred him to SDDOC regarding any complaint about the lack of ventilation in the handicap bathroom. Johnson became "verbally upset" and told Health Services that "I knew you wouldn't do anything about this." Hanvey Affidavit, ¶49; Exhibit 14.

The record further reflects that although Johnson, when later seen by Health Services on September 28, 2017, indicated that he "does become

slightly short of breath when he is in a very humid place such as after taking a shower," he told the provider that he would "use a SL Nitrol which he feels does improve some." Hanvey Affidavit, ¶50; Exhibit 6. Johnson, when seen by Health Services on October 30, 2018, again complained of "increased shortness of breath especially while lying down and taking a shower." Hanvey Affidavit, ¶51; Exhibit 15. Although indicating that he had to use his Ventolin Inhaler while in the shower, Johnson told Health Services that he was "able to get relief after using this." Hanvey Affidavit, ¶51; Exhibit 15. When recently seen by Health Services on July 11, 2019, Inmate Johnson stated that he was "doing quite well with his chronic problems." Hanvey Affidavit, ¶36; Exhibit 18. At no time did Johnson complain about the alleged humidity in the shower area. Johnson, therefore, as previously found by the Court, "has not demonstrated that his physicians have instructed him to stay out of humid environments or that Defendants knew of any such instruction and were deliberately indifferent to Johnson's alleged medical needs." Doc. 42, p. 550. He has, once again, thus failed to state a claim upon which relief can be granted.

NOT HANDICAPPED ENOUGH TO USE HANDICAP BATHROOM

Johnson, in his "second instance of retaliation," alleges that "Unit Staff went so far as claiming that Plaintiff was not handicap enough to use the regular handicap toilet." Doc. 9, p. 41, ¶3; Doc. 20, p. 329. In an Informal Resolution Request dated September 26, 2016, Johnson complained that Unit Coordinator Eilers "said that being on the handicap shower list does not mean you can use the handicap bathroom." Doc. 9-5, p. 78. According to Johnson,

he was told that he "must be on the handicap schedule" to use the bathroom.[9]

Johnson, therefore, "want[ed] to know who in Health Services do I need to see

to get written approval to use the handicap bathroom complete shower, sink

and toiler." Doc. 9-5, p. 78. In response thereto, Johnson was advised that

"There is a handicap toilet in the general population restroom for your use."

Doc. 9-5, p. 79.

In a subsequent Request for Administrative Remedy dated September 27,

2016, Johnson complained that "I qualify as handicapped enough to use the

handicap shower in the handicap bathroom" and therefore wanted to "know

who at Health Services can qualify me as handicapped enough to use the

handicap toilet in the handicap bathroom." Doc. 9-5, p. 80. As indicated,

however, in an Administrative Remedy Response dated October 17, 2016, "Unit

Staff have spoken to you [Johnson] about this issue in regards to which

restroom to use." Doc. 9-5, p. 81. Johnson was instructed to "Please work

with your Unit Team should you have any additional questions." Doc. 9-5, p.

81.

---

[9] Johnson, in his Informal Resolution Request complained that "so being in a
wheelchair and under chronic care does not qualify you to use the handicap
toilet." Doc. 9-5, p. 78. As already indicated elsewhere herein, Johnson only
uses the wheelchair as a convenience "for any distances." Exhibits 2, 6. He is
more than capable of standing and walking short distances. Johnson, himself,
when seen by Health Services on December 27, 2016, readily admitted that he
"has an order that says I should be walking more." Exhibit 4. As already
indicated elsewhere herein, Johnson was again recently informed, on July 11,
2019, of "the need for him to exercise." Hanvey Affidavit, ¶39; Wallinga
Affidavit, ¶39; Exhibit 18. There is nothing in his medical records which would
suggest that Johnson is physically unable to use the general population
bathroom. Hanvey Affidavit, ¶42; Wallinga Affidavit, ¶42.

The affidavits attached hereto reflect that this issue was raised when Johnson became upset that another inmate was using the shower in the handicap bathroom and he wanted to use the "other facilities" in the bathroom. Christensen Affidavit, ¶31; Eilers Affidavit, ¶13. Johnson is said to be pretty controlling when it comes to which other inmates can use the handicap bathroom and appears to expect that said bathroom be available to him whenever he wishes to use it. Christensen Affidavit, ¶32; Eilers Affidavit, ¶14. At the present time, there are, including Johnson, six (6) inmates scheduled to use the shower in the handicap bathroom. Christensen Affidavit, ¶33; Eilers Affidavit, ¶15. There is, as indicated elsewhere herein, a handicap toilet located in the General Population bathroom for inmates to use when the handicap bathroom is in use. Christensen Affidavit, ¶34; Doc. 9-5, p. 79. Johnson, despite his assertions to the contrary, is allowed to use the "regular handicap toilet, sink, mirror and anything else in the regular handicap bathroom" provided that it is not already in use by another inmate. Christensen Affidavit, ¶35; Eilers Affidavit, ¶17.

Johnson, therefore, has once again failed to show that "but for" his filing of grievances, he would have been allowed to use the "regular handicap toilet, sink and mirror" at the time in question. As indicated above, there are other inmates at the MDSP, in addition to Johnson, currently scheduled to use the handicap shower. The last scheduled shower time in the mornings is from 9:00 to 9:30. Christensen Affidavit, ¶39; Eilers Affidavit, ¶18. The handicap bathroom then remains "open until the next scheduled shower time from 5:00

43

to 5:30. p.m." Christensen Affidavit, ¶39; Eilers Affidavit, ¶18.  The last

scheduled shower time is from 8:30 to 9:00 p.m.  Christensen Affidavit, ¶39;

Eilers Affidavit, ¶19.  Johnson's complaint is based on nothing more than the

fact that he became upset when he wanted to use the "other facilities" in the

handicap bathroom, but another inmate was already in the bathroom using the

shower.  Christensen Affidavit, ¶41; Eilers Affidavit, ¶20.  It appears that

Johnson was merely upset that only some of the inmates on the approved

shower list "adhere to their assigned shower times."  Doc. 9-5, p. 82.  There

has not been even the slightest showing by Johnson that his inability to use

the handicap toilet at the time in question was in any way causally connected

to his filing of grievances.

VERBAL ATTACK

Finally, Johnson alleges that he was the subject of a "verbal attack" from

Defendant Caruana on February 23, 2017.  Doc. 20, p. 329; Doc. 9, p. 43,

¶8.[10]  According to Johnson, Unit Manager Christensen "asked me to go to the

---

[10]Johnson contends that he has also been "subject to harassment by other
inmates."  Doc. 9, p. 44, ¶11.  According to Johnson, he was "informed that
one inmate made the comment to the U.M. that 'you should hand-cuff Johnson
to the new handicap area provided at one of the picknick [sic] tables."  Johnson
complains that "The U.M. should have put a stop to that kind of talk by an
inmate but instead she laughed about it with him."  Doc. 9, p. 44, ¶11.
The record reflects that Johnson, in an Informal Resolution Request date June
5, 2017, referred to "Inmate's lethal plot to chain him to a picnic table" and
complained "nothing was done or said to the inmate."  Doc. 9-19, p. 181.
Johnson wanted officials at the MDSP to "punish the bullies, thugs and
predators" and to "back the victim for once."  Doc. 9-19, p. 181.  Johnson was
later advised, in an Informal Resolution Response dated June 12, 2017, that
his grievance "did not state a claim or issue."  Doc. 9-19, p. 182. The record
herein further reflects that U.M. Christensen has no memory of an inmate
(continued. . .)

front desk," which he did, "only to be met on the way by the so-called ADA Coordinator who started to verbally assaulted [sic] me." Doc. 9, p. 43, ¶8. Johnson contends that Caruana "said very loudly and authoritatively, 'what's your problem,' gesturing with his hand" and "pointing toward the bathroom." Doc. 9-15, p. 158.

The affidavits attached hereto reflect that Caruana did, on the date in question, ask Johnson, to report to the front desk.  Caruana Affidavit, ¶29. Caruana wanted to meet with Johnson in an attempt to ascertain, "as a matter of courtesy," what it was exactly that he thought was wrong with the General Population bathroom.  Caruana Affidavit, ¶29.  When Johnson pointed out to Caruana the "protuberances that he thought were violations," Caruana undertook to "read to him the standards for protuberances from the ADA Accessibility Guidelines which showed that they were not violations."  Caruana Affidavit, ¶30.  Caruana, after said discussion, then left the bathroom.  He does not recall every having yelled or raised his voice at Johnson.  Caruana Affidavit, ¶31.

---

(. . .continued)
every having made such a statement.  Christensen Affidavit, ¶45.  U.M. Christensen also has no memory of ever having "laughed about it." Christensen Affidavit, ¶46.
Finally, Johnson has not and cannot show that he suffered any actual or cognizable injury as a result of the alleged harassment.  As such, Defendants would assert that the alleged harassment did not constitute an "adverse action" so as to satisfy the third element of an ADA retaliation claim pursuant to Title V. *Stebbins v. Hannah,* 2015 WL 5996295, at *3 (E.D. Ark.); *Warren v. Goord,* 2006 WL 1582385, at *21 (W.D.N.Y).  "Absent actual injury, Plaintiff lacks Article III standing to pursue this claim."  *Stebbins,* 2015 WL 5996295, at *3; *Warren,* 2006 WL 1582385, at *21.

Defendants would respectfully submit that Johnson's allegations merit little discussion.  As noted in *Hughbanks v. Dooley,* 2012 WL 346673, at *20 (D.S.D.), "mere threatening language and gestures of a state actor do not, even if true, amount to constitutional violations."  According to the court, "Verbal harassment, abuse and threats, including profanity, without any physical injury, do not amount to constitutional violations no matter how reprehensible the conduct may be."  *Id.* (citing *Kurtz v. City of Shrewsbury,* 245 F.3d 753, 759 (8th Cir. 2001)).  *See also Turner v. Mull,* 784 F.3d 485, 492 (8th Cir. 2015); (citing *Hopson v. Fredericksen,* 961 F.2d 1374, 1378 (8th Cir. 1992)).  A similar analysis has been adopted when addressing alleged claims of retaliation under Title VII.

As noted in *Sutherland v. Mo. Dept. of Corrections,* 580 F.3d 748, 752 (8th Cir. 2009), to establish a retaliation claim under Title VII, plaintiff was required to show that (1) she engaged in protected activity; (2) a reasonable person would have perceived the alleged retaliatory action materially adverse; and (3) that adverse action was causally connected to her protected conduct.  These are the same elements that Johnson must satisfy in order to succeed on his claim of retaliation under Title V.  As noted in the Order issued by this Court on March 22, 2018, Johnson must establish that (1) he engaged in statutorily protected activity; (2) adverse action was taken against him; and (3) a causal connection exists between the adverse action and protected activity.  Doc. 20, p. 323.

For purposes of their present motion, Defendants will focus their argument on whether Johnson can establish that Defendant Caruana engaged in "adverse action" for purposes of satisfying the second element or requirement for prevailing on his purported retaliation claim.  In finding that the District Court had properly granted defendants' motion for summary judgment, the court in *Sutherland* held that "petty slights and minor annoyances in the work place … are not actionable." *Id.* at p. 752.  Said behavior, according to the court, were "not sufficient to support a conclusion that they were materially adverse retaliatory actions." *Id.* (citing *Clegg v. Ark. Dept. of Corrections,* 496 F.3d 922, 929 (8th Cir. 2007)).  In *Clegg,* the court found that "Normally petty slights, minor annoyances and simple lack of good manners will not create such deterrence." *Id.* (citing *Vajda v. Mesabi Acad. of Kidspeace, Inc.,* 484 F.3d 546, 552 (8th Cir. 2007)).  It was said that "trivial harms resulting from retaliatory behavior do not meet the [objective] standard set forth in *Burlington N. & Santa Fe Ry. Co., v. White,* 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)." *Clegg,* 496 F.3d at 929.

A similar position was taken in *Kelly v. New York State Office of Mental Health,* 200 F.Supp.3d 378, 4013 (E.D. N.Y. 2016) where the court found that "A plaintiff must show 'material adversity' because it is important to separate significant from trivial harms." *White,* 548 U.S. at 68.  It was once again said that "Petty slights, minor annoyances and simple lack of good manners will not normally constitute adverse actions for purposes of a retaliation claim." *Kelly,* 200 F.Supp.3d at 403.  *See also Johnson v. Watkins,* 803 F.Supp.2d 561, 571

(Miss. 2011); *Touvian v. Dist. Of Columbia,* 330 F.Supp.3d 246, 254 (D.C. 2018).  According to the court, "Title VII does not set forth a general civility code for the American workplace."  *Johnson,* 803 F.Supp.3d at 571; *Clehm v. BAE Systems Ordnance Systems, Inc.,* 291 F.Supp.3d 775, 791 (W.D Va. 2017). The court again stressed that "It is important to separate significant from trivial harms."  *Id.* (citing *White,* 548 U.S. at 68).

Defendants, therefore, would assert that, despite Johnson's apparent beliefs to the contrary, Title V "does not protect an individual … from all retaliation, but from retaliation that produces an injury or harm."  *See. Lance v. Greyhound Lines, Inc.,* 244 F.Supp.3d 147, 155 (D.C. 2017) (interpreting Title VII's anti-retaliation provision).  *See also Hinton v. Virginia Union University,* 185 F.Supp.3d 807, 832 (E.D. Va. 2016) (citing *White,* 548 U.S. at 67); *Patzy v. Hochberg,* 217 F.Supp.3d 357, 361 (D.C. 2016).  Defendant Caruana's "loud and authoritative" tone of voice would simply fall into the category of "petty slights" or "minor annoyances" which are insufficient to establish "adverse action" for purposes of satisfying the second element of a retaliation claim. *Sutherland,* 580 F.3d at 752.

WHEREFORE, Defendants would respectfully ask that their Motion for Summary Judgement be granted and that Johnson's Complaint for alleged violations of the ADA be dismissed with prejudice.

Dated the 11th day of September 2019.

/s/ Frank Geaghan

Frank Geaghan
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
Telephone: (605) 773-3215
Email: frank.geaghan@state.sd.us

CERTIFICATE OF COMPLIANCE

1.    I certify that the foregoing document is within the limitation

provided for in D.S.D. Civ. LR 7.1(B)(1) using Bookman Old Style typeface in

12-point type.  Said Brief contains 13,244 words.

2.    I certify that the word processing software used to prepare this

brief is Microsoft Word 2016.

Dated this 11th day of September 2019.

/s/ Frank Geaghan
Frank Geaghan
Assistant Attorney General


CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2019, I electronically filed the
foregoing document and attachments with the Clerk of the Court for the United
States District Court for the Southern Division by using the CM/ECF system.
Participants in the case who are registered CM/ECF users will be served by the
CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF
users.  I have mailed the foregoing document by First-Class mail, postage
prepaid, or have dispatched it to a third-party commercial carrier for delivery
within 3 calendar days, to the following non-CM/ECF participants:

Leslie Johnson
110 E. Martha Street
Tea, South Dakota  57064

/s/ Frank Geaghan
Frank Geaghan
Assistant Attorney General